## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT,
HAZARDOUS MATERIALS AND WASTE MANAGEMENT DIVISION,

      Plaintiff,

v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF THE ARMY;
UNITED STATES FISH AND WILDLIFE SERVICE; and
SHELL OIL COMPANY,

      Defendants.

---

## COMPLAINT

---

Plaintiff, the Colorado Department of Public Health and Environment,

Hazardous Materials and Waste Management Division ("the Division" or "the State"

or "CDPHE"), through the undersigned counsel, makes the following Complaint

pursuant to 42 U.S.C. §§ 6961(a), 9621(e)(2), and Colo. Rev. Stat. § 25-15-308.

### INTRODUCTION

1.    The Division comes before the Court to compel compliance with the Colorado

Hazardous Waste Act, Colo. Rev. Stat. §§ 25-15-301 to 316 (2017) ("the Act"

or "CHWA," and referred to as "CHWMA" in some historic documents), the

Colorado Hazardous Waste Regulations, 6 Colo. Code Regs. § 1007-3 (2017) ("the Regulations"), and the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 to 9674 ("CERCLA," also known as "Superfund").

## PARTIES

2.   Plaintiff, the Colorado Department of Public Health and Environment, Hazardous Materials and Waste Management Division, located at 4300 Cherry Creek Drive South, Denver, Colorado, 80246, is the Colorado State agency vested with responsibility for enforcing the Act and the Regulations, and with participating in CERCLA activities in Colorado.  Colo. Rev. Stat. §§ 25-15-301, 25-16-101 and -103 (2017).

3.   Defendant United States of America (the "United States") is a "person" as that term is defined in the Act and the Regulations, Colo. Rev. Stat. § 25-15-101(13); 6 Colo. Code Regs. § 1007-3:260.10, and is subject to and must comply with federal, state, interstate and local requirements respecting hazardous waste management.  42 U.S.C. § 6961(a) (2006).

4.   Defendant United States Department of the Army ("the Army") is a "person" as that term is defined in the Act and the Regulations, Colo. Rev. Stat. § 25-15-101(13); 6 Colo. Code Regs. § 1007-3:260.10, and is subject to and must comply with federal, state, interstate and local requirements respecting hazardous waste management.  42 U.S.C. § 6961(a) (2006).

2

5.  Defendant United States Fish and Wildlife Service ("USFWS") is a "person" as that term is defined in the Act and the Regulations, Colo. Rev. Stat. § 25-15-101(13); 6 Colo. Code Regs. § 1007-3:260.10, and is subject to and must comply with federal, state, interstate and local requirements respecting hazardous waste management.  42 U.S.C. § 6961(a) (2006).

6.  Defendant Shell Oil Company ("Shell") is a Delaware Corporation with a principal street address of 910 Louisiana Street, Houston, Texas, 77002. Shell is a "person" as that term is defined in the Act and the Regulations, Colo. Rev. Stat. § 25-15-101(13); 6 Colo. Code Regs. § 1007-3:260.10, and is subject to and must comply with federal, state, interstate and local requirements respecting hazardous waste management.  42 U.S.C. § 6961(a) (2006).

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's second claim for relief seeks to enforce 42 U.S.C. § 9621(e)(2) and 42 U.S.C. § 9620(h).  Additionally, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff is an executive agency of the State of Colorado and because Defendant Shell is a Delaware Corporation. The Court also has jurisdiction pursuant to 28 U.S.C. § 1367.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 9621(e)(2).

## GENERAL ALLEGATIONS

### Background on the Rocky Mountain Arsenal

8.     The Rocky Mountain Arsenal consists of the contiguous 27 square mile parcel of property located at 5650 Gateway Road, Commerce City, Adams County, Colorado ("the Facility") as shown in Exhibit 1 attached hereto and incorporated by reference.  The Facility is a hazardous waste "facility" as that term is defined in 6 Colo. Code Regs. § 1007-3:260.10.

9.     The entire Facility was under the control of the United States and the Army when the site was first subject to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq. ("RCRA") upon submission of the Army's RCRA Part A application to the United States Environmental Protection Agency ("EPA") in November of 1980.

10.    The United States and the Army have subsequently transferred various portions of the Facility to other entities as shown in Exhibit 2 attached hereto and incorporated by reference.

11.    The Army commenced operations at the Facility in 1942 for the manufacture, assembly, demilitarization and disposal of chemical warfare agents, chemical products, incendiary munitions, chemical munitions, chemical agents, and other hazardous substances.

12.    From 1946 until 1987, the Army leased portions of the Facility to private industry, including Shell.

13.   Shell manufactured pesticides at the Facility from 1952 to 1982.

14.   The Army and Shell stored, treated and disposed of hazardous waste in various hazardous waste units at the Facility.

15.   In particular, the Army and Shell operated Basin F, a hazardous waste surface impoundment, for the storage, treatment and disposal of liquid and solid listed and characteristic hazardous wastes.  Hazardous wastes and hazardous constituents were released to the environment from Basin F.  In December 1981, disposal of hazardous waste to Basin F was terminated, but hazardous wastes remained in the unit and the unit continued to operate and discharge hazardous wastes into the environment.

16.   The Army's and Shell's waste management and disposal practices at Basin F and elsewhere resulted in significant levels of contamination across the Facility.  The principal contaminants include organochlorine pesticides, heavy metals, agent-degradation products and manufacturing by-products, and chlorinated and aromatic solvents.  All of these constituents constitute threats to human health and the environment.

### RCRA/CHWA Corrective Action, the CERCLA remedy, and the Creation of the Rocky Mountain Arsenal Wildlife Refuge

17.   In November 1980, the Army submitted a Part A RCRA Permit application to EPA for the treatment, storage and disposal of hazardous wastes at the Facility.  The Facility was automatically granted interim status as a result of

its submittal of the Part A permit application in accordance with 40 C.F.R. §
270.70.

18.   (a) In 1982, EPA promulgated rules applicable to hazardous waste
management facilities that operate land disposal units, including rules
governing closure of those units, and rules requiring owners and operators
of landfills, waste piles, surface impoundments, or land treatment units
that ceased the receipt of wastes prior to July 26, 1982, but did not certify
closure until after January 26, 1983, to obtain a post-closure permit if
they leave hazardous waste in place after closure (40 C.F.R. § 270.1
(1983); Parts 100, 264 and 265 of the CHWA regulations contain the State
versions of these requirements).

(b) Section 3004(u) of the 1984 Hazardous and Solid Waste Amendments to
RCRA requires that any permit issued to a treatment, storage or disposal
facility after November 8, 1984 address corrective action for releases of
hazardous waste or hazardous constituents from any Solid Waste
Management Unit ("SWMU") or area of the facility used for the
treatment, storage or disposal of solid waste at any time, irrespective of
whether the unit is or ever was intended for the management of solid
waste.  RCRA Section 3005(c)(3) requires that RCRA permits contain all
conditions necessary to protect human health and the environment, and
can require corrective action at any other "areas of concern" at the facility.

(c) For interim status facilities that close without obtaining an operating permit, the requirement for a post-closure permit (typically issued after completion of closure) performed an important regulatory function (Standards Applicable to Owners and Operators of Closed Facilities; Post-Closure Permit Requirement; Closure Process, 63 Fed. Reg. 56,712 (October 22, 1998)).  Post-closure permits must address the hydro-geologic characteristics of the site and extent of any groundwater contamination, must meet the Part 264 rather than Part 265 requirements of RCRA, most significantly the groundwater monitoring requirement of Part 264, Subpart F, and must address facility-wide corrective action.

19.     On May 2, 1983, the Army submitted the Formal Part B RCRA Permit Application, Volumes I and II to EPA for the treatment, storage and disposal of hazardous wastes in various units at the Facility.  On May 10, 1984, EPA issued a Notice of Deficiency and Completeness Review on the Part B RCRA Permit Application.

20.     On October 19, 1984, the State of Colorado received final authorization, effective November 2, 1984, to implement CHWA in lieu of EPA implementing RCRA.  42 USC § 6926(b) (2006); Colorado: Final Authorization of State Hazardous Waste Management Program, 49 Fed. Reg. 41,036 (October 19, 1984).  On November 14, 1984, the Army submitted a revised Part B Hazardous Waste Permit Application to the Division.

21.     A final operating permit for the Facility was not issued; however, on October
        1, 1986, the Division issued a final modified Closure Plan for Basin F
        pursuant to the CHWA and the Regulations, and on November 14, 1986, the
        Division filed a complaint against the Army alleging violations of the
        groundwater monitoring requirements in the Regulations.  The complaint
        was amended in 1987 to include the Army's failure to close Basin F in
        accordance with the Closure Plan.

22.     In 1987, EPA listed the Facility on the National Priorities List of the nation's
        most contaminated sites to be remediated via CERCLA, as amended by the
        Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub. L.
        No. 99-499, and the Community Environmental Response Facilitation Act of
        1992 ("CERFA"), Pub. L. No. 102-426; and the National Contingency Plan
        and other implementing regulations.

23.     In 1988, the CERCLA interim response action for Basin F was initiated.

24.     In 1989, a U.S. District Court opinion stated that CERCLA was intended to
        operate independently of and in addition to RCRA and held that CHWA
        enforcement was not precluded by CERCLA.  *Colorado v. U.S. Dept. of Army*,
        707 F. Supp. 1562, 1569-70 (D. Colo. 1989).

25.     On February 17, 1989, EPA, the Army, Shell, the Agency for Toxic Substance
        Disease Registry ("ATSDR") and the Department of the Interior ("DOI," the
        federal agency which houses the USFWS) entered into a Federal Facility

Agreement ("FFA").  The FFA established a cooperative procedure to assess, select and implement response actions to address the release or threat of release of hazardous substances, pollutants or contaminants at or from the Facility.  The FFA also memorialized institutional controls ("ICs," sometimes referred to as "land use controls" or "LUCs") at the Facility and stated the United States must retain ownership of the Facility.  Colorado did not sign the FFA because it wished to make clear its CHWA authorities were being reserved; however, the State did sign and agree to participate in the dispute resolution procedures associated with the FFA for cleanup and closure of the Facility.

26.   In 1989, the Division issued a compliance order (Final Amended Compliance Order No. 89-05-2301) to the Army, citing 42 violations of CHWA and the Regulations, including failure to comply with the 1986 Basin F Closure Plan. The compliance order was subsequently amended and reissued on September 22, 1989 to also require a modification to the 1986 Closure Plan to bring it up to date with conditions on-site that had changed in the intervening three years.

27.   The Rocky Mountain Arsenal National Wildlife Refuge Act of 1992, Pub. L. No. 102-402 ("Refuge Act") created the Rocky Mountain Arsenal National Wildlife Refuge (the "Refuge") on portions of the Facility.  The Refuge Act

established the process for transfer of management responsibilities and jurisdiction over the Refuge from the Army to the USFWS.

28.     In 1992, the Federal Facilities Compliance Act amended RCRA to expressly waive federal sovereign immunity and make clear federal solid and hazardous waste facilities must comply with state authorities.  42 U.S.C. § 6961 (2006).

29.     In 1993, the Tenth Circuit ruled that "The Rocky Mountain Arsenal is a hazardous waste treatment, storage and disposal facility subject to RCRA regulation."  *United States v. Colorado*, 990 F.2d 1565, 1569 (10th Cir. 1993), cert. denied 114 S. Ct. 922 (1994).  "As a federal facility, the Arsenal is subject to regulation under RCRA.  More importantly, because EPA has delegated RCRA authority to Colorado, the Arsenal is subject to regulation under CHWMA."  *Id*. at 1576 (internal citations omitted).  Additionally, the Tenth Circuit stated "the Army is obligated to comply with RCRA/CHWMA regulations applicable to interim status facilities pending closure of Basin F pursuant to an approved closure plan."  *Id*. at 1512 n. 11, 1582 n. 22.  The Army subsequently petitioned the Supreme Court of the United States to review the decision of the Tenth Circuit, but was denied on January 24, 1994 (114 S. Ct. 922 [1994]).

30.     The On-Post Record of Decision ("On-Post ROD"), pursuant to CERCLA, formally established the selected remedy and the cleanup approach for the

Facility.  The On-Post ROD was signed by the Army, EPA, and CDPHE on June 11, 1996, with concurrence from Shell and DOI.  The large volume of contaminated soil present on the site precluded a remedy in which all contaminants could be excavated and cost effectively treated.  (On-Post ROD, pp. 8-10).  Under the On-Post ROD, cleanup of the Facility was therefore based on the removal of fixed volumes of contaminated soil from across the Facility's various SWMUs (see Exhibit 3, attached hereto and incorporated by reference) and consolidation of contaminated soils under RCRA-equivalent covers and disposal in two RCRA subtitle C hazardous waste landfills, approved under the 1996 Compliance Order on Consent No. 96-06-07-01 between the Army and the Division.

31.   The On-Post ROD did not require complete characterization of the horizontal and vertical extent of contamination at the Facility, including its SWMUs, nor did it involve remediation of these areas to unrestricted use levels. Instead, the On-Post ROD relied on the United States retaining ownership and stated that **"continued restrictions on land use or access are included as an integral component of all on-post alternatives"** (On-Post ROD, pp. 7-2, 10-4) (emph. added) to protect human health and the environment from undiscovered waste and hazardous constituents both known to exist and as-yet undiscovered and left in place at the Facility.

32.   On October 22, 1998, EPA promulgated the RCRA Closure/Post-Closure Rule.
      The Rule allows regulatory flexibility to issue a post-closure permit to a
      facility or impose the same regulatory requirements in an enforceable
      document issued under an alternate non-permit authority in lieu of a post-
      closure permit, for example, an administrative order.  Facilities that receive
      enforceable documents in lieu of post-closure permits must meet the same
      substantive requirements that apply to units receiving post-closure permits
      (e.g. Part 264 operating and post-closure requirements, groundwater
      monitoring requirements, and facility-wide corrective action requirements).
      Colorado adopted the 1998 federal rule on September 21, 1999 (6 Colo. Code
      Regs. § 1007-3, Part 8.40).

33.   On August 24, 2010, Basin F at the Facility was certified closed in accordance
      with 6 Colo. Code Regs. § 1007-3:265.115, with hazardous waste and
      hazardous constituents left in place, in accordance with the Basin F Closure
      Plan.  Post-closure activities for Basin F are defined in the Basin F Post-
      Closure Plan.

34.   Owners and operators of surface impoundments, landfills, land treatment
      units, and waste piles that certified closure after January 26, 1983, and that
      did not remove all the waste or contamination, must have a post-closure
      permit in accordance with 6 Colo. Code Regs. § 1007-3:100.10(b), or an
      enforceable document in lieu of a post-closure permit in accordance with 6

Colo. Code Regs. § 1007-3:100.10(d).  The post-closure permit must address the applicable 6 Colo. Code Regs. § 1007-3, Part 264 Groundwater Monitoring, Unsaturated Zone Monitoring, Corrective Action and Post-Closure Care Requirements in the Regulations in accordance with 6 Colo. Code Regs. § 1007-3:100.41(b)(14).  These requirements mirror EPA's RCRA regulations.

35.    From 2010 to present, the State has worked cooperatively with the United States, the Army, USFWS, Shell, and EPA to develop and prepare the following management documents fundamental to the CERCLA remedy and to satisfy CHWA Facility post-closure permit requirements.  The United States, Army, USFWS and Shell's compliance with these documents and all amendments will ensure adequate protection of human health and the environment at the Facility:

(a) The On-Post and Off-Post Records of Decision ("RODs;" additionally, the term "ROD" refers to the On-Post Record of Decision).

(b) The Land Use Control Plan, finalized October 10, 2013.

(c) The March 2010 Long-Term Monitoring Plan for Groundwater and Surface Water, finalized March 3, 2010.

(d) The Basin F Post-Closure Plan, finalized October 6, 2011.

(e) The Hazardous Waste Landfill Post-Closure Plan, finalized March 16, 2011.

13

(f)  The Enhanced Hazardous Waste Landfill Post-Closure Plan, finalized May 20, 2010.

(g)  The Rocky Mountain Arsenal RCRA–Equivalent, 2-, and 3-Foot Covers Long-Term Care Plan, finalized September 29, 2011.

(h)  The Response Plan for Recovered Material Potentially Presenting an Explosive Hazard, as amended, dated September 10, 2012.

## The Defendants' Owner and Operator Liability

36.  The United States is the "owner" of the Facility, as that term is defined in Colo. Rev. Stat. § 25-15-101(12.5) and 6 Colo. Code Regs. § 1007-3:260.10.

37.  Some historic documents indicate the Army is the "owner" of the Facility.

38.  The Army is an "operator" of the Facility, as that term is defined in Colo. Rev. Stat. § 25-15-101(12), 6 Colo. Code Regs. § 1007-3:260.10, and case law because the Army disposed of hazardous waste and/or hazardous constituents at the Facility and because that waste has been left in place at the Facility. Additionally, the Army makes decisions regarding the Facility's compliance with environmental regulations.

39.  Shell is an "operator" of the Facility as that term is defined in Colo. Rev. Stat. § 25-15-101(12), 6 Colo. Code Regs. § 1007-3:260.10, and case law because Shell disposed of hazardous waste and/or hazardous constituents at the Facility and because that waste has been left in place at the Facility. Additionally, Shell makes environmental compliance decisions concerning

ongoing funding of the remedy and participates in decisions regarding the Facility's compliance with environmental regulations.

40. The USFWS is an "operator" of the portions of the Facility that comprise the Refuge, for the limited purpose of ensuring compliance with the institutional controls at the Refuge, as the term "operator" is defined in Colo. Rev. Stat. § 25-15-101(12), 6 Colo. Code Regs. § 1007-3:260.10, and case law.  Specifically, USFWS is an agency that makes environmental compliance decisions regarding the following land use controls, critical to the protectiveness of the remedy, and without which the remedy would not satisfy CHWA corrective action requirements:

(a) There shall be no potable use of on-post groundwater or surface water.

(b) There shall be no agricultural use of RMA property.

(c) There shall be no residential use of RMA property.

(d) There shall be no consumption of fish, livestock, or game taken from RMA.

(e) Access to capped and covered areas (See Exhibit 4, attached hereto and incorporated by reference, and Exhibit 2, Army Maintained Areas) shall be restricted to protect the integrity of containment systems.

(f) No basements shall be used or built on-post without prior approval from the Division.

(g) There shall be no major alteration of hydro-geologic characteristics that may adversely affect natural drainage or animal habitat.

(h) Prior to leasing any RMA land, the United States must first obtain approval from the Division.

(i) No excavation shall be permitted into site SSA-3b (see Exhibit 2), without prior approval from the Division.  Signage to prevent unintentional excavation must be maintained.

(j) Remedy integrity, even if procedural or day to day responsibilities for maintaining access and other institutional controls are transferred, shall be maintained.

41.  The USFWS manages the portions of the Facility that were designated as the Refuge by the Refuge Act.  The Refuge is part of the Facility as defined in 6 Colo. Code Regs. § 1007-3:260.10, and the institutional controls on the Refuge are critical to the protectiveness of the remedy.

42.  The Army operates Basin F, the Enhanced Hazardous Waste Landfill, the Hazardous Waste Landfill, the RCRA-Equivalent, 2-, and 3-foot covers at the Facility, and is responsible for monitoring groundwater and surface water at the Facility.

## Recent Facility History

43.  On June 7, 2016, the Division conducted an inspection at the Facility. During the inspection, the Division determined Basin F, the Hazardous Waste Landfill, the Enhanced Hazardous Waste Landfill, and several SWMUs at the Facility where hazardous waste or hazardous constituents

remain in place or have been disposed of are being operated by Army and/or USFWS.

44.    On October 25, 2016, the Division conducted a review of the records for the Facility at the Division Records Center.  Neither a post-closure permit application nor a request from the Facility to obtain an alternate enforceable agreement in lieu of a post-closure permit in accordance with 6 Colo. Code Regs. § 1007-3:100.10(d) have been received.

45.    On December 20, 2016, the Division issued a compliance advisory to the Army and USFWS alleging multiple violations of CHWA, the Regulations, CERCLA, and many of the management documents listed in paragraph 35 above.  The advisory's allegations included the absence of a post-closure permit or alternate enforceable agreement and an illegal transfer of federal land in the northeast corner of the Facility (Section 20 Lands, 14.388 acres adjacent to 96th Avenue and Buckley Road) to Commerce City on August 20, 2007.

## FIRST CLAIM FOR RELIEF

### (Failure to comply with the post-closure permit requirements of 6 Colo. Code Regs. § 1007-3:100.10)

46.    The above allegations are incorporated herein.

47.    Defendant United States of America owned, and the other Defendants operate or operated, surface impoundments, landfills, land treatment units, and waste piles at the Facility.  These were closed after January 26, 1983.

None of the Defendants have submitted a post-closure permit application or a request from the Facility to obtain an alternate enforceable agreement in lieu of a post-closure permit in accordance with 6 Colo. Code Regs. § 1007-3:100.10(d).

## SECOND CLAIM FOR RELIEF

### (Violation of the On-Post ROD, CERCLA 120(h) and Colorado Executive Order D-013-98, for illegally transferring land outside of federal ownership)

48.   The above allegations are incorporated herein.

49.   CERCLA empowers a state to "enforce any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform."  42 USC § 9621(e)(2) (2006).

50.   The ROD, the FFA, and the Refuge Act prohibit any transfers of land outside the federal government other than the five land transfers specifically provided for in the Refuge Act.

51.   Any sale or transfer of Facility real property must comply with 42 U.S.C. § 9620(h) (CERCLA 120(h)), as well as Colorado Executive Order D-013-98 dated June 18, 1998, and the incorporated Colorado Statewide Defense Initiatives/CDPHE Joint Policy dated June 19, 1998.

52.   Defendants transferred, or allowed to be transferred, ownership of a portion of land in the northeast corner of the Facility (Section 20 Lands, 14.388 acres

adjacent to 96th Avenue and Buckley Road) from the federal government to
Commerce City, Colorado on August 20, 2007.

53.    Defendants violated the ROD and the FFA when they transferred, or allowed
to be transferred, the ownership of this land.

54.    Defendants failed to comply with the provisions of CERCLA 120(h), the
Colorado Executive Order D-013-98 dated June 18, 1998, and the
incorporated Colorado Statewide Defense Initiatives/CDPHE Joint Policy
dated June 19, 1998, in transferring, or allowing the transfer of, ownership of
this land without determining the property was suitable for transfer, without
notifying the State of the transfer, without ensuring proper notices were
given to the transferee, and without ensuring the appropriate remedial
covenants appear on title.

## PRAYER FOR RELIEF

THEREFORE, the Division requests that this Court:

1.    Issue a mandatory injunction requiring Defendants to, within sixty (60) days,
either:

(a) Submit an application for a post-closure permit as required by 6 Colo.
Code Regs. § 1007-3:100.10.  At a minimum, the application must contain
the applicable 6 Colo. Code Regs. § 1007-3:100.41(b)(14) information for
post-closure permits.  This information includes but is not limited to

details regarding the post-closure care and maintenance of the hazardous waste management units, details regarding groundwater protection and monitoring, and details for each SWMU at the Facility to comply with 6 Colo. Code Regs. § 1007-3:264.101, including details regarding land use control requirements used throughout the Facility; or

(b) Request in writing that an enforceable document(s) imposing the requirements of 6 Colo. Code Regs. § 1007-3:265.121 be used in lieu of a post-closure permit.  At a minimum, the enforceable document(s) must:

    (i)      meet the requirements of 40 C.F.R. 271.16(e);

    (ii)      meet the applicable 6 Colo. Code Regs. § 1007-3:100.41.(b)(14) requirements for post-closure permits (per 6 Colo. Code Regs. § 1007-3:265.121(a)(1));

    (iii)      satisfy the requirements for facility-wide corrective action in 6 Colo. Code Regs. § 1007-3:264.101 (per subsection 265.121(a)(2));

    (iv)      satisfy the requirements of 6 Colo. Code Regs. §§ 1007-3:264.91 - 264.100 for protection and monitoring of groundwater (per subsection § 265.121(a)(3)); and

    (v)      satisfy the requirements of an environmental covenant set forth in Colo. Rev. Stat. §§ 25-15-317 to -326 (per subsection 265.121(a)(4)).

2. Issue a mandatory injunction requiring Defendants to, for the illegal transfer of land described in paragraphs 45 and 52 above, within sixty (60) days:

(a) Submit documentation demonstrating completion of all required actions under 42 U.S.C. § 9620(h), Colorado Executive Order D-013-98 dated June 18, 1998, and the incorporated Colorado Statewide Defense Initiatives/CDPHE Joint Policy dated June 19, 1998; and

(b) Submit a plan for State review and approval to institute any corrective action for the transferred land as necessary to protect human health and the environment pursuant to 6 Colo. Code Regs. § 1007-3:264.101.

Respectfully submitted September 14, 2017 by the undersigned counsel:

CYNTHIA H. COFFMAN
Attorney General

*/s/ Lukas B. Staks*
LUKAS B. STAKS*
Assistant Attorney General
Solid and Hazardous Waste/CERCLA
  Litigation Unit
Natural Resources and Environment Section
Attorneys for Colorado Department of Public
  Health and Environment

Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado  80203
Telephone:  (720) 508-6251
FAX:  (720) 508-6039
E-Mail:  lukas.staks@coag.gov
*Counsel of Record