IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02223-RM-MEH

COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT, HAZARDOUS
MATERIALS AND WASTE MANAGEMENT DIVISION,

      Plaintiff,

v.

UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT OF THE ARMY,
UNITED STATES FISH AND WILDLIFE SERVICE, and
SHELL OIL COMPANY,

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**Michael E. Hegarty, United States Magistrate Judge**.

      In separate motions, Defendant Shell Oil Company ("Shell") and Defendants United States of America, United States Department of the Army ("Army") and United States Fish and Wildlife Service ("FWS") (collectively "Federal Defendants"), seek to dismiss Plaintiff Colorado Department of Public Health and Environment's ("CDPHE") Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Honorable Raymond P. Moore referred the motions to this Court for report and recommendation.

      The Court first addresses CDPHE's state law claim, which alleges Defendants violated the Colorado Hazardous Waste Act ("CHWA") by failing to obtain a post-closure permit. The Court recommends finding that CDPHE states a claim as to all Defendants except the United States of America, which is entitled to sovereign immunity.

      The Court then analyzes CDPHE's second claim, which alleges Defendants violated the

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and various agreements between the parties when they transferred land at the Rocky Mountain Arsenal ("Arsenal") without receiving approval from Colorado. The Court first recommends holding that CDPHE fails to assert a claim against Shell. Then, the Court finds that the United States of America is entitled to sovereign immunity. The Court also finds that the Army and FWS are entitled to sovereign immunity to the extent CDPHE seeks an injunction requiring that they comply with the specific provisions of the Colorado Executive Order D-013-98 ("Executive Order") and the CDPHE Joint Policy ("State Policy"). However, CDPHE's claims against the Army and FWS are not subject to dismissal in their entirety, because CDPHE also seeks an injunction mandating that the Army and FWS comply with provisions of CERCLA.

Accordingly, the Court grants in part and denies in part Shell's and Federal Defendants' Motions to Dismiss.

## BACKGROUND

### I.  Facts

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by CDPHE in its Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(1) pursuant to *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) and under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The relevant factual background for the Arsenal spans numerous years, many of which have been spent in litigation. In 1942, the Army began using the Arsenal to manufacture and dispose of chemical warfare agents and other hazardous substances. Compl. ¶ 11, ECF No. 1. From 1946 until

1987, the Army leased portions of the Arsenal to private companies, such as Shell. *Id.* ¶ 12. Shell manufactured pesticides at the Arsenal from 1952 to 1982. *Id.* ¶ 13. Until 1981, the Army and Shell disposed of their hazardous waste in a service impoundment called Basin F. *Id.* ¶¶ 14–15. Although the Army and Shell stopped using Basin F in 1981, hazardous waste remained in the unit, and the unit continued to discharge waste into the environment. *Id.* ¶ 15.

In 1980, the Army submitted a permit application for the treatment, storage, and disposal of hazardous waste at Basin F pursuant to the Resource Conservation and Recovery Act ("RCRA"). *Id.* ¶ 17. The Army continued through the permitting process until May 1984, when the Environmental Protection Agency ("EPA") issued a notice of deficiency on the Army's application. *Id.* ¶¶ 17–19.

Then, in October 1984, EPA granted the State of Colorado final authorization to implement the CHWA in lieu of EPA enforcing the RCRA. *Id.* ¶ 20. This would have required the Army to seek an operating permit from CDPHE instead of EPA. However, rather than issue an operating permit for Basin F, CDPHE promulgated a final modified closure plan for Basin F on November 14, 1986. *Id.* ¶ 21. CDPHE subsequently issued various CHWA compliance orders to the Army. *Id.* ¶¶ 21, 26.

In 1987, EPA listed the Arsenal on a list of the nation's most contaminated sites to be remediated pursuant to CERCLA. *Id.* ¶ 22. Accordingly, a CERCLA interim response action was initiated in 1988. *Id.* ¶ 23. On February 17, 1989, EPA, the Army, Shell, the Agency for Toxic Substance Disease Registry, and the Department of the Interior entered into a Federal Facility Agreement ("FFA"). *Id.* ¶ 25. The FFA established a cooperative procedure to address the release of hazardous substances from the Arsenal. *Id.*

In 1992, Congress created the Rocky Mountain Arsenal National Wildlife Refuge ("Refuge") on portions of the Arsenal. *Id.* ¶ 27. Congress provided a process for transferring control of the Refuge from the Army to FWS. *Id.* FWS now manages the Refuge, which requires it to make a variety of environmental compliance decisions, such as ensuring that the Refuge is not used for agricultural or residential purposes. *Id.* ¶ 40.

On June 11, 1996, EPA issued its On-post Record of Decision ("ROD") as part of the CERCLA remedy. *Id.* ¶ 30. The ROD, which the Army, EPA, and CDPHE signed, formally established a remedy and cleanup approach for the Arsenal. *Id.* Pursuant to the ROD, the parties were to remove fixed volumes of contaminated soil from various solid waste management units ("SWMUs"), including Basin F. *Id.* Because the success of the ROD relied on the United States retaining ownership of the Arsenal, it placed restrictions on land use and access. *Id.* ¶ 31.

On October 22, 1998, EPA promulgated the RCRA Closure/Post-Closure Rule, which allows parties to establish the post-closure permit requirement through a variety of alternative documents. *Id.* ¶ 32. Post-closure permits detail operating requirements, groundwater monitoring requirements, and facility-wide corrective action requirements. *Id.* Colorado subsequently adopted the rule, which gave CDPHE authority to allow alternative documents for hazardous waste units that certified closure after January 26, 1983. *Id.* ¶¶ 33–34. On August 24, 2010, CDPHE certified Basin F closed with hazardous materials left in place. *Id.* ¶ 33. CDPHE finalized a post-closure plan for Basin F on October 6, 2011. *Id.* ¶ 35.

Therefore, Defendants have worked cooperatively with CDPHE to develop a variety of documents, including the ROD, the long-term monitoring plan, and post-closure plans for various hazardous waste units at the Arsenal. *Id.* ¶ 35. The Army, Shell, and FWS continue to make

decisions regarding whether specific SWMUs comply with environmental regulations. *Id.* ¶¶ 38–43.

In 2016 CDPHE conducted an investigation and records review of the Arsenal. *Id.* ¶¶ 43–44. The inspection revealed that Defendants have not submitted post-closure permit applications or alternative document requests for multiple waste landfills and SWMUs. *Id.* Additionally, CDPHE discovered that the Federal Government transferred ownership of a portion of the Arsenal to Commerce City, Colorado on August 20, 2007. *Id.* ¶¶ 45, 52.

## II. Procedural History

Based on these factual allegations, CDPHE filed the Complaint on September 14, 2017. Compl., ECF No. 1. CDPHE pleads two claims for relief. *Id.* ¶¶ 46–54. First, CDPHE asserts Defendants violated 6 Colo. Code Regs. § 1007-3:100.10 by failing to submit a post-closure permit application or a request to obtain an alternative agreement. *Id.* ¶ 47. CDPHE's second claim contends Defendants violated CERCLA §120(h), the ROD, the FFA, the Executive Order, and the State Policy when they transferred ownership of a portion of the Arsenal to Commerce City without receiving authorization from CDPHE. *Id.* ¶¶ 48–54.

On October 6, 2017, Shell responded to the Complaint by filing the present Motion to Dismiss, ECF No. 12-1. Although Shell contends this Court lacks original subject matter jurisdiction over CDPHE's state law claim as to it, Shell does not dispute this Court's supplemental jurisdiction to decide these claims. *Id.* at 5–9. Turning to the merits, Shell argues the Court should dismiss the CERCLA claim, because CDPHE's allegations make clear that Shell did not own any of the allegedly transferred property. *Id.* at 7. Regarding CDPHE's first claim for relief, Shell contends the CHWA does not require it to obtain a post-closure permit, because it is not an operator of Basin F. *Id.* at 8–16. Regardless, Shell argues that CERCLA waives state permit requirements

when a CERCLA remedial action is ongoing at the facility. *Id.* at 17–18.

CDPHE filed a response brief on October 27, 2017. Resp. to Shell's Mot. to Dismiss, ECF No. 19. CDPHE argues it sufficiently pleads its CERCLA claim, because it alleges Shell allowed Arsenal property to be transferred out of federal ownership. *Id.* at 7. Regarding its state law claim, CDPHE contends Shell is an operator of the Arsenal, because Shell regularly makes environmental compliance decisions and funds the CERCLA remedy. *Id.* at 8–16. Finally, CDPHE contends the CERCLA permit waiver does not apply to the Arsenal. *Id.* at 17–19. On November 13, 2017, Shell filed a Reply in Support of its Motion to Dismiss, ECF No. 24.

On November 27, 2017, the Court permitted Shell and CDPHE to file supplemental briefs addressing Shell's argument that CERCLA waives CHWA's post-closure permit requirement. Minute Order, ECF No. 25. Shell and CDPHE filed their supplemental briefs on December 5, 2017. ECF Nos. 26–27. The Court held oral argument on Shell's motion on December 15, 2017. ECF No. 35.

On December 18, 2017, Federal Defendants filed the present Motion to Dismiss, ECF No. 37. Federal Defendants first contend that two applicable statutes of limitations bar CDPHE's CHWA claim. *Id.* at 7–8. Similar to Shell, Federal Defendants next argue that CERCLA's permit waiver precludes any requirement that they obtain a post-closure permit. *Id.* at 8–13. Federal Defendants then assert that the United States of America, as a whole, is entitled to sovereign immunity, and FWS is not an operator of any landfill or service impoundment at which a post closure permit is required. *Id.* at 13–16.

Moving to CDPHE's CERCLA claim, Federal Defendants contend the six-year statute of limitations applicable to all civil actions against the United States bars this claim. *Id.* at 17–19.

Alternatively, Federal Defendants assert that the section of CERCLA on which CDPHE relies does not allow injunctive relief. *Id.* at 19. Lastly, Federal Defendants argue they are entitled to sovereign immunity to the extent CDPHE seeks that they comply with the Executive Order and State Policy. *Id.* at 19–20.

CDPHE filed a response on January 18, 2018. Resp. to Federal Defs.' Mot. to Dismiss, ECF No. 40. CDPHE first contends the statute of limitations does not bar its state law claim, because the two- and five-year limitations periods contemplate continuing violations. *Id.* at 4–7. Additionally, CDPHE contends the CERCLA permit waiver does not preclude this claim, the United States of America has waived sovereign immunity, and it sufficiently alleges FWS is an operator of the Arsenal. *Id.* at 8–13. With regard to the federal claim, CDPHE first argues that disputed issues of fact exist as to when the claim accrued. *Id.* at 14–17. Then, CDPHE contends CERCLA contemplates injunctive relief, and the Federal Government has waived its sovereign immunity for CERCLA violations. *Id.* at 18–20. On February 8, 2018, Federal Defendants filed a Reply in Support of Their Motion, ECF No. 41.

## LEGAL STANDARDS

### I.     Dismissal under Fed. R. Civ. P. 12(b)(1)

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015) (recognizing that federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). A court lacking jurisdiction "must dismiss the cause at any stage

of the proceeding in which it becomes apparent that jurisdiction is lacking." *Id.* (citing *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013)). A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere [conclusory] allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Pueblo of Jemez*, 790 F.3d at 1151. Accordingly, CDPHE bears the burden of establishing that this Court has jurisdiction to hear its claims.

## II.     Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679–80. Second, the court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)).

"The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

## ANALYSIS

The Court first recommends holding that CDPHE's state law claim plausibly asserts a cause of action against Shell, the Army, and FWS. However, the Court recommends finding that the United States of America is entitled to sovereign immunity over this claim. Next, the Court recommends holding that Shell and the United States of America are entitled to dismissal of CDPHE's second claim for relief, but CDPHE states a claim as to the Army and FWS.

## I. CDPHE's First Claim for Relief: Violation of a CHWA Regulation

CDPHE's first cause of action alleges Defendants violated 6 Colo. Code Regs. § 1007-3:100.10 by failing to obtain a post-closure permit. Compl. ¶¶ 46–47, ECF No. 1. That regulation provides in relevant part:

> RCRA requires a permit for the "treatment", "storage", and "disposal" of any "hazardous waste" as identified or listed in Part 261 of these regulations. . . . Owners and operators of surface impoundments, landfills, land treatment units, and waste pile units that received waste after July 26, 1982, or that certified closure (according to § 265.115 of these regulations) after January 26, 1983, must have post-closure permits, unless they demonstrate closure by removal or decontamination as provided under § 100.10(b) and (c), or obtain an enforceable document in lieu of a post-closure permit, as provided under paragraph (d) of this section.

6 Colo. Code Regs. § 1007-3:100.10. CDPHE alleges Defendants did not obtain a post closure permit for the following impoundments and units at the Arsenal: Basin F, the Hazardous Waste Landfill, the Enhanced Hazardous Waste Landfill, and several SWMUs. Compl. ¶¶ 43–44. The

Court will separately address liability as to Shell and the Federal Defendants.

A.    Claim as to Shell

The Court recommends holding that CDPHE states a violation of 6 Colo. Code Regs. § 1007-3:100.10 against Shell. CDPHE alleges Shell is an operator of Basin F, and CERCLA § 121(e)(1) does not preclude the post-closure permit requirement in this instance.

1.    CDPHE Sufficiently Alleges that Shell Is an Operator of Basin F.

According to Shell, CDPHE's allegations that Shell makes decisions regarding funding of the CERCLA remedy and participates in environmental compliance decisions are insufficient as a matter of law to render Shell an operator of Basin F. Shell's Mot. to Dismiss 12–16, ECF No. 12-1. The Court disagrees.

Colorado law does not make clear when an entity is an "operator"; however, case law interpreting the term in the CERCLA context applies to CDPHE's state law claim. Colorado law defines "operator" as, "[T]he person operating a hazardous waste management facility or site either by contract or permit." 6 Colo. Code Regs. § 1007:3-260.10 (2018); *see also* Colo. Rev. Stat. § 25-15-101(12) (2010) (same). Because of the inherently circular nature of this definition, it does not help discern when an entity may be considered an operator of a surface impoundment. When the meaning of a term used in RCRA or CHWA is unclear, courts often look to the CERCLA definition of the same term. *See United States v. Power Eng'g Co.*, 125 F. Supp. 2d 1050, 1070 (D. Colo. 2000) ("Although these tests have been devised to determine whether an individual or entity is an 'operator' under the Comprehensive Environmental Response Compensation and Liability Act, there is no reason not to apply them to the 'operator' inquiry under the RCRA given the similarity of the definitions in both statutes."); *Bd. of Cty. Comm'rs of Cty. of La Plata, Colo. v. Brown Grp. Retail,*

*Inc.*, No. 08-cv-00855-LTB, 2009 WL 1108463, at *4 (D. Colo. Apr. 24, 2009) (concluding a finding that an individual or entity meets the definition of an operator under CERCLA is sufficient to show that the individual or entity is an operator under RCRA).

In *United States v. Bestfoods*, the Supreme Court defined "operator" under CERCLA as one who "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[1] 524 U.S. 51, 66–67 (2000). Therefore, CDPHE must allege that Shell manages, directs, or conducts disposal operations or environmental compliance decisions at Basin F.[2]

The Court finds that CDPHE's Complaint contains such allegations. CDPHE pleads that "Shell makes environmental compliance decisions concerning ongoing funding of the remedy and participates in decisions regarding [the Arsenal's] compliance with environmental regulations." Compl. ¶ 39. Although CDPHE does not allege that Shell makes decisions specific to Basin F,

---

[1] Shell argues that "[t]he specific context of *Bestfoods* does not apply here," because *Bestfoods* involved whether a parent company could be held liable for its subsidiary's actions. Shell's Mot. to Dismiss 17 n.7. Although this may be true, the Court does not analogize this case to the facts of *Bestfoods*. Instead, the Court relies on *Bestfoods* only for its interpretation of "operator."

[2] Shell contends the definition of "operator" under CERCLA is distinguishable by the manner in which Colorado law defines operator. Shell's Mot. to Dismiss 16. However, CHWA regulations and CERCLA define "operator" in substantially similar manners. *Compare* 6 Colo. Code Regs. § 1007:3-260.10 (2018) ("[T]he person operating a hazardous waste management facility or site either by contract or permit."), *with* 42 U.S.C. § 9601(20)(A)(ii) (2002) ("[A]ny person owning or operating such facility."). For this reason, courts in this District have relied on CERCLA's definition of operator in determining whether an entity is an operator under RCRA/CHWA. *See Power Eng'g Co.*, 125 F. Supp. 2d at 1070 ("Although these tests have been devised to determine whether an individual or entity is an 'operator' under the Comprehensive Environmental Response Compensation and Liability Act, there is no reason not to apply them to the 'operator' inquiry under the RCRA given the similarity of the definitions in both statutes.").

CDPHE pleads that Shell disposed of hazardous waste at Basin F, *id.* ¶ 15, and now participates in decisions regarding the Arsenal's compliance with environmental regulations. *Id.* ¶ 39. The Court finds that these allegations, taken together, plausibly allege that Shell makes environmental compliance decisions with regard to Basin F, and is thus an operator of Basin F.[3]

Shell argues that to be an operator of a waste management unit, a company must have a significant degree of control over the operations of the unit. Shell's Mot. to Dismiss 16. As an initial matter, the cases Shell cites in support of its proposition discuss whether a parent company may be considered an operator of a unit that its subsidiary manages. *See United States v. Friedland*, 173 F. Supp. 2d 1077 (D. Colo. 2001); *Bestfoods*, 524 U.S. at 71. As such, the cases analyzed whether the parent exercised a sufficient degree of control over the day-to-day operations of its subsidiary. *Friedland*, 173 F. Supp. 2d at 1094–98; *Bestfoods*, 524 U.S. at 55. It does not necessarily follow from this line of cases that an entity involved with a waste management unit must exercise a significant level of control over that unit before being considered an operator. Indeed, Shell distinguishes the facts of *Bestfoods* on the basis that *Bestfoods* involved a parent/subsidiary relationship. Shell's Mot. to Dismiss 17 n.7. Regardless, even if an entity must substantially control the operations of a waste management unit before being considered an operator, the Court cannot hold as a matter of law that making environmental compliance decisions is an insufficient level of control. This is particularly true in light of the Supreme Court's statement that conducting such decisions renders an entity an operator under CERCLA. *See Bestfoods*, 524 U.S. at 66–67.

---

[3]Pursuant to 6 Colo. Code Regs. § 1007-3:100.10, post-closure permits are required for specific units. Therefore, to be required to obtain a post-closure permit, an entity must operate a specific hazardous waste management unit. If the evidence submitted at summary judgment indicates that Shell makes only general environmental compliance decisions not specific to any hazardous waste management unit, Shell may be entitled to summary judgment at that time.

In sum, accepting as true CDPHE's allegation that Shell makes decisions regarding Basin F's compliance with environmental regulations, Shell is an operator of Basin F.

2.     CERCLA § 121(e)(1) Does Not Preclude CDPHE's Claim.

Shell asserts that even if it is an operator of Basin F, CERCLA § 121(e)(1) precludes any requirement that it obtain a post-closure permit. Shell's Mot. to Dismiss 17–18. CERCLA § 121(e)(1) provides: "No Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely onsite, where such remedial action is selected and carried out in compliance with this section." 42 U.S.C. § 9621(e)(1). Therefore, by its plain language, § 121(e)(1) would seem to preclude CHWA's requirement that Shell obtain a post-closure permit.

However, in *United States v. State of Colorado*, the Tenth Circuit noted that CERCLA's permit waiver "arguably conflicts with [two CERCLA savings provisions] when a state has been authorized to issue and enforce RCRA permits . . . ." 990 F.2d 1565, 1582 (10th Cir. 1993). The first of these savings provisions is 42 U.S.C. § 9652(d), which provides: "Nothing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." The second savings provision, 42 U.S.C. § 9614(a), states: "Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." In *State of Colorado*, the facts did not require the court to resolve the conflict, because Colorado did not contend the Army needed to obtain a new permit; it sought to require only an updated permit. 990 F.2d at 1582. Because CDPHE now demands that Defendants obtain a new

13

permit (the post-closure permit), the Court must interpret CERCLA § 121(e)(1) and resolve this inconsistency.

The Tenth Circuit has characterized the CERCLA permit waiver as an express preemption clause—i.e., it preempts federal, state, and local permitting requirements when a CERCLA remedial action is underway. *See United States v. City & County of Denver*, 100 F.3d 1509, 1513 (10th Cir. 1996). When interpreting such a provision, courts must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). However, courts should interpret preemption clauses consistently with savings provisions, which are intended to preserve state law claims. *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 895 (2000) (holding that an express preemption provision did not bar common law claims, because the savings clause expressly preserved them); *Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2220 (2014) (Sotomayor J. dissenting) ("[P]rovisions of a text should be interpreted in a way that renders them compatible, not contradictory." (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012))). "Where the text of a preemption clause is open to more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 335 (2008).

Viewing the CERCLA permit waiver consistently with the savings provisions, the Court finds the permit waiver does not apply to hazardous waste units that were regulated under RCRA/CHWA prior to CERCLA. Put differently, the CERCLA permit waiver does not preempt permitting requirements for units that are being regulated under RCRA/CHWA at the time the CERCLA action commences.

Importantly, 42 U.S.C. § 9652(d) states that CERCLA does not affect or modify existing

obligations under other federal or state laws. By using the words "affect" and "modify," Congress intended to preserve existing federal and state obligations regarding the release of hazardous substances. Applying this to 42 U.S.C. § 9621(e)(1), CERCLA waives permit requirements only when they are not in effect at the initiation of the CERCLA remedial action.[4] Indeed, if CERCLA waived pre-existing CHWA permit obligations, CERCLA would affect and modify existing obligations under state law. However, if CDPHE did not begin regulating the waste management unit under CHWA until after CERCLA regulation commenced, the implementation of the CERCLA remedial action would not affect or modify any existing state law requirements. Thus, this interpretation comports with the general rule that courts are to "fit, if possible, all parts [of a statute] into [a] harmonious whole." *Scialabba*, 134 S. Ct. at 2220 (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)).

Moreover, the Court's interpretation is consistent with that of the EPA. In a 1992 memorandum opinion, EPA stated, "CERCLA does not relieve DOE from the requirement to obtain post-closure permits for pre-existing, RCRA-regulated units at [CERCLA] sites." RCRA Post-Closure Permits for Regulated Units at NPL Sites, 1992 WL 754572, at *2 (Environmental

---

[4] CDPHE alleges that the RCRA post-closure rule was promulgated in 1998. Compl. ¶ 32. If this were true, the post-closure permit requirement would not have "existed" at the initiation of the CERCLA remedial action. However, the post-closure permit requirement existed long before Congress amended the RCRA in 1998. Indeed, the 1986 version of 40 C.F.R. § 270.1(c) required permits during the post-closure period. 40 C.F.R. § 270.1(c) (1986). EPA amended the regulations in 1987 to make the post-closure permit requirement more explicit. *See* Hazardous Waste; Codification Rule for the 1984 RCRA Amendments, 52 Fed. Reg. 45788-01, 45794–96 (Dec. 1, 1987); *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 398 (D.C. Cir. 1989) (discussing the 1987 amendments to 40 C.F.R. § 270.1(c)). The 1998 amendment that CDPHE references merely added the provision that operators may use enforceable documents in lieu of post-closure permits. 40 C.F.R. § 270.1(c) (1999). Therefore, the post-closure permit requirement existed when the CERCLA response action was initiated at the Arsenal in 1988.

Protection Agency July 2, 1992). According to EPA, although operators need not obtain RCRA permits to conduct a remedial action selected and carried out in compliance with CERCLA, § 121(e)(1) "does not eliminate the need to secure a permit where the facility is required to obtain a permit due to the presence of a RCRA subtitle C treatment, storage or disposal unit that was not created by the CERCLA action." *Id.* In making this determination, EPA relied on the differences between RCRA "facilities" and CERCLA "sites" and its authority to use either CERCLA or RCRA to accomplish cleanup at a site. *Id.* Thus, according to EPA, when a hazardous waste unit is created by another regulatory scheme, such as RCRA or CHWA, the permit wavier does not apply.

Although this type of informal memorandum is not subject to sufficiently formal procedures to merit full *Chevron* deference, the Court may still grant it respect to the extent it has the power to persuade. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in . . . policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference. They are 'entitled to respect,' but only to the extent that they are persuasive."); *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 283–84 (2009) (stating that an EPA informal memorandum was entitled to some measure of deference). The Court finds EPA's interpretation of CERCLA § 121(e)(1) persuasive and affords it due deference.

In sum, in light of the savings provisions in CERCLA and the Supreme Court's mandate to "accept the reading that disfavors preemption" when preemption is uncertain, *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005), the Court construes § 121(e)(1) as waiving all federal, state, and local permitting requirements that did not exist at the time the CERCLA remedial action was commenced. Because CDPHE alleges the hazardous waste units at the Arsenal were regulated

under RCRA prior to the initiation of the CERCLA remedial action, Compl. ¶¶ 17–23 (stating that CDPHE issued a final modified closure plan for Basin F in 1986, and the CERCLA response action was not initiated until 1988), waiving RCRA/CHWA permitting requirements would affect an existing state law obligation. Accordingly, the permit wavier does not apply in this instance.

B.    Claim as to Federal Defendants

As to Federal Defendants, the Court first recommends finding that the United States of America is entitled to sovereign immunity. Then, the Court recommends holding that CDPHE states a violation of 6 Colo. Code Regs. § 1007-3:100.10 against the Army and FWS. Disputed issues of fact exist as to the Army and FWS' statute of limitations defense, and CDPHE alleges that FWS is an operator of waste management units at the Arsenal.[5]

1.    The United States of America Is Entitled to Sovereign Immunity.

Federal Defendants argue that the provision of RCRA waiving the Federal Government's sovereign immunity applies only to federal agencies, not the United States of America as a whole. Federal Defs.' Mot. to Dismiss 13–15. Because Congress did not make a wavier explicit as to the United States of America, the Court agrees with Federal Defendants.

42 U.S.C. § 6961(a)—RCRA's sovereign immunity waiver—provides in relevant part:

Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any solid waste management facility or disposal site, or (2) engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may

---

[5] Federal Defendants also argue that CERCLA § 121(e)(1) precludes CDPHE's first claim. Federal Defs.' Mot. to Dismiss 8–13. Because the Court's preceding analysis as to Shell dealt solely with the interpretation of § 121(e)(1), it applies equally to Federal Defendants.

be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements. . . . The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement (including, but not limited to, any injunctive relief, administrative order or civil or administrative penalty or fine referred to in the preceding sentence, or reasonable service charge). . . . Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief.

Thus, the plain language of the provision supports a finding that the immunity applies to "[e]ach department, agency, and instrumentality of the executive, legislative, and judicial branches," *id.*, not to the United States of America as a whole.[6]

To be sure, the statute also provides that the "United States hereby expressly waives any immunity otherwise applicable to the United States." 42 U.S.C. § 6961(a). However, when read in context with the first sentence of the provision, the Court finds that this refers to the United States, acting through Congress, waiving sovereign immunity for federal agencies and departments. Similarly, the statute says, "Neither the United States, nor any agent, employee, or officer thereof, shall be immune . . . ." *Id.* The Court does not find any clear indication that Congress used "the United States" to waive immunity for the United States of America as a whole. Instead, "the United States" refers to the divisions of the Federal Government that must comply with RCRA/CHWA requirements—departments, agencies, and instrumentalities. Moreover, to the extent these two

---

[6] The Tenth Circuit has stated in dicta that "[t]he United States has thus waived it sovereign immunity from state-imposed permit requirements . . . ." *Colo. Dep't of Pub. Health & Env't v. United States*, 693 F.3d 1214, 1217 (10th Cir. 2012). However, the court was not tasked with deciding whether the United States, as a whole, has waived its sovereign immunity. Indeed, the court considered the federal defendants collectively as the "United States." *Id.* Furthermore, in light of the first sentence of the immunity provision, the Court interprets the Tenth Circuit's statement as meaning that Congress waived sovereign immunity for departments, agencies, and instrumentalities of the United States.

provisions render the statute ambiguous, "[a] waiver of sovereign immunity must be 'strictly construed, in terms of its scope, in favor of the sovereign.'" *Sossamon v. Texas*, 563 U.S. 277, 292 (2011) (quoting *Lane v. Peña*, 518 U.S. 187, 192 (1996)); *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992) (same). Strictly construed, 42 U.S.C. § 6961(a) does not waive immunity for the United States of America as a whole.

The legislative history of 42 U.S.C. § 6961(a) also supports the Court's interpretation. While explaining the purpose of the provision, the Committee on Environment and Public Works stated,

> A cornerstone of Federal environmental law is that Federal agencies are subject to the same environmental requirements and must comply with those requirements in the same manner and to the same extent as all other persons. Institutions owned or operated by the Federal government are at least as responsible, if not more responsible, for protecting the public health and safety and the environment as are private institutions.

S. Rep. No. 102-67, at 2 (1991). Therefore, Congress clarified that it intended to hold "Federal agencies," not the United States of America, to the same environmental regulations as private institutions. Furthermore, in the same bill Congress amended the definition of "person" to ensure "that all of the provisions of [RCRA] apply in the same manner and to the same extent to both Federal and non-Federal persons." *Id.* at 5. 42 U.S.C. § 6903(15) now defines person as, "[A]n individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body and shall include *each department, agency, and instrumentality of the United States*." 42 U.S.C. § 6903(15) (emphasis added). If Congress wanted to waive sovereign immunity for the United States of America as a whole, it could have easily done so by referring to the United States of America in §§ 6961(a) or 6903(15). *See* Hazardous Waste Management System; Supplement to Preamble to Final Codification Rule, 51 Fed. Reg. 7722-01 (Mar. 5, 1986) ("Congress could easily

have referred to the 'United States' [in 42 U.S.C. § 6961] if it intended the entire federal government to respond together.").

In sum, the Court finds that the only clear waiver of immunity in 42 U.S.C. § 6961(a) applies to "each department, agency, and instrumentality of the . . . Federal Government." Accordingly, the Court recommends dismissing the United States of America from the first claim for relief. However, because the Army and FWS are agencies, departments, or instrumentalities of the United States, the Court must analyze Federal Defendants' remaining arguments as applied to them.

2.     Disputed Issues of Fact Exist as to the Army and FWS' Statute of Limitations Defense.

Federal Defendants contend CHWA's statute of limitations bars CDPHE's first claim. Federal Defs.' Mot. to Dismiss 7–8. Colo. Rev. Stat. § 25-15-308(4)(a) includes two separate limitations periods. The statute provides in relevant part, "Any action pursuant to this part 3 shall commence within two years after the date upon which the department discovers an alleged violation of this part 3 or within five years after the date upon which the alleged violation occurred, whichever date occurs earlier." Colo. Rev. Stat. § 25-15-308(4)(a). CDPHE argues that neither the two- or five-year periods bar its claim, because the statute contemplates continuing violations—i.e., the statutory periods start anew each day that an entity fails to obtain a post-closure permit. Resp. to Federal Defs.' Mot. to Dismiss 4–7. The Court agrees that a violation of the post-closure permit requirement is a single, continuing violation. However, this does not end the Court's inquiry. The Court will then address whether the continuing nature of the violation renders this claim barred under the two- and five-year provisions.

a.     Continuing Violation

Based on Colorado continuing violations precedent and case law from other districts in the

permitting context, the Court recommends holding that failure to obtain a post-closure permit is a single, continuing violation. Although not in the statute of limitations context, the Colorado Court of Appeals has stated for purposes of a daily penalty that an action is a continuing violation if it can be cured by simply taking the required action. *Crowell v. Indus. Claim Appeals Office*, 298 P.3d 1014, 1017 (Colo. App. 2012) ("[T]he difference between a one-time violation and a continuing violation hinges on whether the violation is subject to being cured by subsequent action."). Because 6 Colo. Code Regs. § 1007-3:100.10 requires a post-closure permit for the entirety of the post-closure period, the failure to obtain a permit can be cured anytime throughout the post-closure period.

Additionally, case law discussing the statute of limitations for failing to obtain operating and pre-construction permits bolsters the Court's interpretation. In *United States v. Cinergy Corp.*, the court explained:

> The distinction between preconstruction permit violations and operation permit violations is crucial. It is generally recognized that failure to obtain an operations permit is a continuing violation for each day of operation without the permit. . . . In contrast, failure to obtain a preconstruction permit is a discrete violation that occurs at the time of construction.

397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005) (quoting *United States of America v. S. Ind. Gas & Elec. Co.*, No. IP 99-1692-C-M/F, 2002 WL 1760752, at *4 (S.D. Ind. July 26, 2002)). Similarly, in *United States v. Westvaco Corp.*, the court stated that failing to obtain an operations permit "would be continuing since every day of operation without an operating permit is another violation. In contrast, a violation for failure to obtain a construction permit does not continue once the unpermitted construction is completed." 144 F. Supp. 2d 439, 444 (D. Md. 2001). Regardless of whether post-closure permits are more similar to operating or pre-construction permits, failing to

obtain a permit is a continuing violation. If post-closure permits regulate continuing post-closure operations, then similar to operating permits, not obtaining one is a continuing violation. If post-closure permits are more accurately classified as pre-construction permits, then the violation would continue at least through the post-closure period. *See Westvaco Corp.*, 144 F. Supp. 2d at 444 (stating that a violation for failure to obtain a pre-construction permit continues until construction is complete). Because the post-closure period is ongoing, Basin F Post-Closure Plan 7, ECF No. 37-2, the alleged violation is continuing.[7]

Federal Defendants argue that the Court's interpretation would render Colo. Rev. Stat. § 25-15-308(4)(b) meaningless. That provision states:

> If any action has not been commenced within the limitation period provided by paragraph (a) of this subsection (4) in connection with any disposal of hazardous waste without either state or federal interim status, a federal permit, or a permit granted by the department pursuant to section 25-15-303, the department, within two years after the date upon which the department discovers such disposal, may issue an order pursuant to this section requiring action to remediate such disposal.

Colo. Rev. Stat. § 25-15-308(4)(b). Thus, if CDPHE does not commence an action for wholesale regulation of a disposal unit within the limitations period, CDPHE may still issue an order requiring remediation of that disposal.

The Court does not find this provision relevant to its analysis, because CDPHE alleges an unpermitted post-closure process, not an unpermitted disposal. Subsection (4)(b) provides a mechanism through which CDPHE can ensure remediation of a hazardous waste disposal, notwithstanding that the statute of limitations for enforcement of the permitting requirement has

---

[7] The Court may consider the Basin F Post-Closure Plan at the motion to dismiss stage, because CDPHE's Complaint incorporates it by reference. *See, e.g.*, *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

expired. *See id.* (stating that CDPHE may "issue an order . . . requiring action to remediate *such disposal*." (emphasis added)). However, CDPHE does not allege that Defendants disposed of hazardous waste without a permit. Instead, CDPHE asserts that Defendants commenced the post-closure period without the required permit. Compl. ¶¶ 47–48. As such, there is no disposal to remediate, and Subsection (4)(b)'s provision regarding unpermitted disposals does not assist the Court in determining whether failure to obtain a post-closure permit is a continuing violation.

Moreover, if Subsection (4)(b) applied to post-closure permits it would not change the Court's interpretation. Federal Defendants argue that the Colorado General Assembly would not have needed to enact the more limited exception in Subsection (4)(b) if it intended a broad continuing violations exception. Federal Defs.' Reply in Supp. of Mot. to Dismiss 2–3, ECF No. 41. The Court disagrees. Interpreted as a continuing violation, the statute of limitations begins to run when the post-closure process is complete. If CDPHE did not bring a civil claim within five years of the post-closure process' completion, Subsection (4)(a) would bar a subsequent claim. The exception in Subsection (4)(b) would permit CDPHE to issue an order requiring remediation within two years of discovering the failure to obtain a post-closure permit. Thus, Subsection (4)(b) would still have a purpose—namely, allowing CDPHE to issue an order requiring appropriate remediation notwithstanding the applicability of the statute of limitations. As applied to Basin F at the Arsenal, the post-closure period began in 2011 and will continue at least through 2041. Basin F Post-Closure Plan 7. Under a continuing violation theory, the five-year statute of limitations will begin to run in 2041. If CDPHE did not bring suit prior to 2046, Subsection (4)(a) would bar a subsequent civil action regarding the failure to obtain a permit. However, if CDPHE did not discover the permitting violation until 2048, Subsection (4)(b) would permit CDPHE to issue an order before 2050 regarding

any necessary remediation resulting from that violation. Therefore, interpreting a violation of 6 Colo. Code Regs. § 1007-3:100.10 as a single, continuing violation does not render Subsection (4)(b) without purpose.

Federal Defendants next argue that the Colorado Supreme Court's holding in *People v. Thoro Products Co.*, 70 P.3d 1188 (2003) supports a finding that the alleged violation is not continuing. Federal Defs.' Reply in Supp. of Mot. to Dismiss 3. In that case, the court considered whether the five-year statute of limitations in Subsection (4)(a) barred criminal charges for the unpermitted disposal of hazardous waste. *Thoro Products Co.*, 70 P.3d at 1191–99. The court held that "unpermitted disposal," as used in the criminal statute, did not constitute a continuing offense. *Id.* at 1199. Accordingly, the court found that the statute of limitations begins to run after the last affirmative act of disposal; it is not tolled during the passive migration of waste. *Id.*

The Court does not find this case helpful in determining whether 6 Colo. Code Regs. § 1007-3:100.10 contemplates a continuing violation. Indeed, *Thoro Products* analyzed whether an "unpermitted disposal" is a continuing violation under an entirely different statute. 70 P.3d at 1191–99. In contrast, the section of 6 Colo. Code Regs. § 1007-3:100.10 that CDPHE alleges Federal Defendants violated requires operators to obtain permits for the post-closure period, not for the disposal of hazardous waste. This is an important distinction, because disposing of waste involves an affirmative act. Thus, the Colorado Supreme Court held that the statute of limitations begins to run at the last affirmative act. *Thoro Products Co.*, 70 P.3d at 1199. Commencing the post-closure period without a permit does not involve an affirmative act of disposal. By its very nature the unlawful conduct is the failure to do something. Moreover, the court in *Thoro Products* interpreted the allegedly violated criminal statute in the defendant's favor pursuant to the rule of

lenity.  *Id.* at 1198–99.  Because the relevant section of 6 Colo. Code Regs. § 1007-3:100.10 is not criminal, no such presumption exists in favor of Federal Defendants.

In sum, the Court finds that failure to obtain a post-closure permit is a single, continuing violation.  However, this finding does not end the Court's inquiry.  The Court must still address whether the continuing nature of the alleged violation renders the claim barred by the two- and five-year statutory periods.

b.      Two-Year Statute of Limitations

Notwithstanding that a violation of the post-closure permit requirement is continuing, the two-year statute of limitations begins to run when a state actor discovers the violation.  Colo. Rev. Stat. § 25-15-308(4)(a) requires two separate facts for the two-year statute of limitations to begin running: (1) a violation and (2) discovery of that violation.  *See* Colo. Rev. Stat. § 25-15-308(4)(a) (stating that an action must be brought "within two years after the date upon which the department discovers an alleged violation").  Applied to the post-closure context, the violation first occurs when an operator of a waste management unit begins the post-closure period without obtaining a permit.  *See* 6 Colo. Code Regs. § 1007-3:100.10.  If CDPHE were to learn of the failure to obtain a permit on the first day of the post-closure period, both requirements for the statute of limitations would be met on that date, and the period would begin to run, regardless of the fact that the violation continues.

The Court's interpretation is consistent with the Tenth Circuit's holding in *Sierra Club v. Oklahoma Gas & Electric Co.*, 816 F.3d 666 (2016).  In that case, the court accepted without deciding that the failure to receive a permit was a single, continuing violation.  *Id.* at 672. Regardless of the fact that the violation continued, the court held that the statutory period began to

run when the claim first accrued, because the statute provided that a case must be brought within five years of the date the claim first accrues. *Id.* at 672–74. Similarly, Colo. Rev. Stat. § 25-15-308(4)(a) requires that a case be brought within two years of the date on which CDPHE discovered the violation. Because the failure to obtain a post-closure permit can be discovered only once, the two-year limitations period begins to run when CDPHE first discovers the failure to obtain a post-closure permit, regardless of the fact that the violation is continuing.

However, the statute of limitations does not presently bar CDPHE's claim, because the applicability of the defense is not apparent on the face of CDPHE's Complaint. *See, e.g.*, *Dummar v. Lummis*, 543 F.3d 614, 619 (10th Cir. 2008) (stating that a statute of limitations defense may be resolved on a motion to dismiss only if its applicability "is apparent on the face of the complaint"). Importantly, Colo. Rev. Stat. § 25-15-308(4)(a) requires actual discovery of a violation, not just that CDPHE should have discovered a violation. Although CDPHE alleges that it certified Basin F closed in 2010 and finalized Basin F's post-closure plan in 2011, Compl. ¶¶ 33, 35, CDPHE's knowledge that Basin F was in post-closure, without more, does not definitively demonstrate that CDPHE actually knew the Army and FWS failed to obtain a post-closure permit. Should the Army and FWS present undisputed evidence after discovery indicating that CDPHE knew of the alleged violation before 2015, the Army and FWS may be entitled to summary judgment on their statute of limitations defense. However, the applicability of the defense is not apparent on the face of the Complaint solely because CDPHE knew Basin F was in post-closure.

c.    Five-Year Statute of Limitations

To the extent the Army and FWS argue that the five-year statute of limitations bars this claim, the Court finds that the limitations period does not begin to run until the continuing violation

is complete. Unlike for the two-year period, Colo. Rev. Stat. § 25-15-308(4)(a) states that the five-year period begins to run when the alleged violation "occurred." Because the violation continues to occur at least until the end of the post-closure period, the statute of limitations has not run on CDPHE's claim.

The Tenth Circuit's discussion in *Oklahoma Gas & Electric Co.* supports the Court's holding. In that case, the court found that the statute of limitations for a continuing violation began to run when the violation first accrued, not on the final day of the violation. *Okla. Gas & Elec. Co.*, 816 F.3d at 672–73. The court based its holding on the language of the statute, which stated that the period begins to run when a claim "first accrues." *Id.* at 673. The court distinguished a Supreme Court case in which the Court found that a statutory period commenced on the last asserted occurrence of an illegal action. *Id.* at 673–74 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982)). Importantly, the statute of limitations in *Havens Realty Corp.* stated, "A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred." *Id.* (quoting *Havens Realty Corp.*, 455 U.S. at 380–81). Because "[t]hat statute allowed the limitations period to continue as long as the discriminatory practice 'occurred,'" the Tenth Circuit found it substantially different from the "first accrues language." *Id.* The Court finds the present statute more similar to that in *Havens Realty Corp.* than that in *Oklahoma Gas & Electric Co.* Indeed, Colo. Rev. Stat. § 25-15-308(4)(a) states that an action must commence "within five years after the date upon which the alleged violation *occurred*." Colo. Rev. Stat. § 25-15-308(4)(a) (emphasis added). Therefore, the Court recommends holding that the five-year period begins to run on the last asserted occurrence of the violation. Because the post-closure period for Basin F continues at least until 2041, *see* Basin F Post-Closure Plan 7, the five-year statute of limitations will

not begin to run at least until that date.

3.  CDPHE Sufficiently Alleges FWS Is an Operator of Waste Management Units at the Arsenal.

Federal Defendants contend FWS need not obtain a post-closure permit, because CDPHE does not plead that FWS operates any of the impoundments for which a post-closure permit is allegedly required. Federal Defs.' Mot. to Dismiss 15–16. The Court disagrees. CDPHE alleges that post-closure permits have not been requested for "Basin F, the Hazardous Waste Landfill, the Enhanced Waste Landfill, and several SWMUs at the [Arsenal] where hazardous waste or hazardous constituents remain in place . . . ." Compl. ¶¶ 43–44. Although CDPHE alleges the Army exclusively operates the first three of these units, *id.* ¶ 42, CDPHE states that the Army and/or FWS operate the unpermitted SWMUs. *Id.* ¶ 43. According to CDPHE, FWS operates these units by making environmental compliance decisions regarding land use controls.[8] *Id.* ¶ 40. Under the definition of "operator" the Court discussed above with regard to Shell, an entity who makes decisions about a waste management unit's compliance with environmental regulations is an operator. *See Bestfoods*, 524 U.S. at 66–67 (stating that an operator "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations"). Therefore, CDPHE's allegations are sufficient to plead that FWS is an operator of waste management units at the Arsenal.

---

[8] Of course, if FWS produces undisputed evidence at summary judgment indicating that it does not make environmental compliance decisions concerning any specific units for which a post-closure permit is required, FWS may be entitled to summary judgment at that time.

## II.    CDPHE's Second Claim for Relief: Violation of CERCLA

CDPHE brings it second cause of action pursuant to CERCLA § 121(e)(2), which permits a state to enforce any federal or state standard to which a CERCLA remedial action is required to conform.  Compl. ¶ 49, ECF No. 1.  CDPHE asserts Defendants violated 42 U.S.C. § 9620(h) (CERCLA § 120(h)), the ROD, the Executive Order, the State Policy, and the FFA when they transferred Arsenal land outside of Federal Government ownership or allowed such land to be transferred.  *Id.* ¶¶ 48–54.  CERCLA § 120(h)(1) requires that while transferring land on which hazardous substances were stored, the head of the federal department, agency, or instrumentality provide notice in the contract for sale regarding the hazardous substance.  42 U.S.C. § 9620(h)(1).  Additionally, § 120(h)(3) requires that deeds for properties with hazardous substances contain a covenant warranting that all remedial action has either taken place or will be conducted by the United States.  *Id.* § 9620(h)(3).  The EPA Administrator and the governor of the state in which the facility is located may defer the covenant requirement if they determine the property is suitable for transfer.  *Id.* § 9620(h)(3)(C)(i).  The Executive Order delegates the Colorado Governor's approval authority to CDPHE, Executive Order, ECF No. 37-6, and the State Policy delineates guidelines for CDPHE's approval of deferral requests.  State Policy, ECF No. 37-7.  The FFA is an agreement between EPA, the Army, Shell, the Agency for Toxic Substance Disease Registry, and the Department of the Interior regarding the release of hazardous substances from the Arsenal.  Compl. ¶ 25.  The final allegedly violated document (the ROD) is a CERCLA created document that formally established the cleanup approach for the Arsenal.  *Id.* ¶ 30.

The Court first recommends finding that CDPHE fails to state a claim as to Shell.  As to the Federal Defendants, the Court recommends holding that the United States of America is entitled to

sovereign immunity. Then, the Court recommends finding that CDPHE states a claim as to the Army and FWS.

A.      Claim as to Shell

Shell contends it cannot be liable for transferring land outside the Federal Government, because CDPHE does not allege Shell owned the transferred land. Shell's Mot. to Dismiss 9, ECF No. 12-1. The Court agrees that Shell is not liable for the alleged transfer. Importantly, CERCLA § 120(h) and the State Policy require action only from the federal transferring agency. 42 U.S.C. § 9620(h) (stating that the federal transferring agency must provide notice in a contract for sale and a covenant in a transfer deed); State Policy 7–8 (stating that the "federal transferring agency shall submit [deferral] applications . . . .").

Furthermore, CDPHE does not allege that the documents it claims Shell violated prohibit allowing land to be transferred.[9] Although CDPHE contends that the ROD and the FFA prohibit transfers of land outside the Federal Government, Compl. ¶ 50, CDPHE does not cite to a provision of these documents prohibiting an entity from allowing land to be transferred. Accordingly, CDPHE has pleaded only that it is unlawful to transfer contaminated land without receiving the required approval, not that it is illegal to allow contaminated land to be transferred. Because CDPHE does not allege that Shell actually transferred portions of the Arsenal, the Court recommends finding that CDPHE fails to assert a CERCLA violation against Shell.

_____

[9] Although CDPHE asserts generally that Defendants failed to comply with the allegedly violated statutes and documents by "transferring, or allowing the transfer of, ownership of this land," Compl. ¶ 54, the Court cannot accept this type of conclusory allegation as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

B.     Claim as to Federal Defendants

The Court first analyzes whether Federal Defendants are entitled to sovereign immunity over the CERCLA claim. Then, the Court addresses Federal Defendants' statute of limitations defense. Finally, the Court discusses whether CERCLA § 121(e)(2) permits a state to seek injunctive relief.

1.     The United States of America Is Entitled to Sovereign Immunity, and the Army and FWS Are Entitled to Immunity in Part.

Federal Defendants claim they are entitled to sovereign immunity over an injunction mandating that they comply with the Executive Order and State Policy. Federal Defs.' Mot. to Dismiss 19–20, ECF No. 37. Before addressing this argument, the Court finds it proper to analyze whether the United States of America, as a whole, is entitled to sovereign immunity.[10]

The Court recommends finding that the United States of America is entitled to sovereign immunity over CDPHE's second cause of action. Similar to the immunity waiver in RCRA that the Court discussed above, the plain language of CERCLA's provision does not waive sovereign immunity for the United States as a whole. Indeed, the provision does not require anything of the United States. It provides, "Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, [CERCLA] in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity." 42 U.S.C. § 9620(a)(1) (2017); *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833, 839 (3d Cir. 1994) (construing 42 U.S.C. §

---

[10] Because sovereign immunity is jurisdictional, the Court is not confined to the arguments Federal Defendants advance. Instead, the Court is obligated to consider federal sovereign immunity issues sua sponte. *See, e.g.*, *Smith v. Krieger*, 643 F. Supp. 2d 1274, 1293 (D. Colo. 2009) ("Though the Federal Defendants have not raised sovereign immunity as a defense, the court finds *sua sponte* that they also are entitled to sovereign immunity.").

9620(a)(1) as a sovereign immunity waiver).  Furthermore, CERCLA § 120(h)—the provision

CDPHE alleges the United States of America violated—demands that "the head of such department,

agency, or instrumentality shall include in such contract [for sale] notice of the type and quantity

of such hazardous substance . . . ." 42 U.S.C. § 9620(h)(1).  Construing CERCLA §§ 120(a)(1) and

120(h) narrowly, as the Court must, CERCLA permits an illegal transfer claim only against

departments, agencies, and instrumentalities of the United States. *United States v. Nordic Vill., Inc.*,

503 U.S. 30, 34 (1992) ("[T]he Government's consent to be sued 'must be construed strictly in favor

of the sovereign.'" (quoting *McMahon v. United States*, 342 U.S. 25, 27 (1951))).  Therefore,

CDPHE cannot name the United States of America as a party to this claim.

Because the Army and FWS are undisputedly departments, agencies, or instrumentalities of

the United States, the waiver of sovereign immunity applies to them.  However, Federal Defendants

argue that the Army and FWS are entitled to sovereign immunity over any requirement that they

comply with the Executive Order and State Policy.  Federal Defs.' Mot. to Dismiss 19–20.

According to the Federal Defendants, CERCLA waives sovereign immunity only to the same extent

as nongovernmental entities, and because the Executive Order and State Policy do not apply to

nongovernmental entities, they are entitled to immunity.  *Id.*

The Court finds that the Army and FWS are entitled to immunity over any requirement that

they comply with the Executive Order and State Policy for a more fundamental reason—these

documents are not CERCLA requirements.  CERCLA § 120(a)(1) requires that federal agencies

"comply with[] *this chapter* in the same manner and to the same extent, both procedurally and

substantively, as any nongovernmental entity . . . ." 42 U.S.C. § 9620(a)(1) (emphasis added).  To

the extent the Executive Order and State Policy contain procedural or substantive requirements, they

are not requirements of "this chapter"—i.e., of CERCLA. CDPHE does not point the Court to

another provision of CERCLA that waives the Army's and FWS' sovereign immunity over claims

for violations of the Executive Order and State Policy. In fact, CDPHE acknowledges that these

documents do not contain substantive requirements that the Army and FWS must follow. Resp. to

Federal Defs.' Mot. to Dismiss 19, ECF No. 40 ("CERCLA § 120(h), not the [State Policy], creates

the restrictions specific to federal transfers and the special requirement for federal agencies to obtain

states' approval."). Therefore, the Court does not have jurisdiction to require that the Army and

FWS comply with the specific provisions of the Executive Order and State Policy.[11]

In sum, the Court recommends finding that the United States of America, as a whole, is

entitled to sovereign immunity over CDPHE's second claim for relief. The Army and FWS are

entitled to immunity only to the extent CDPHE seeks an injunction requiring that they follow the

specific provisions of the Executive Order and State Policy.

        2.      Disputed Issues of Fact Exist as to the Application of the Statute of Limitations.

Federal Defendants contend the six-year statute of limitations applicable to all claims against

the United States (28 U.S.C. § 2401(a)) bars CDPHE's CERCLA claim. Federal Defs.' Mot. to

Dismiss 17–19. In support of their argument, Federal Defendants submit evidence indicating that

CDPHE knew or should have known of the land transfer prior to September 14, 2011. ECF Nos.

37-4, 37-5. This evidence consists of notes from a meeting with CDPHE officials at which the

---

[11] Federal Defendants do not contend the Court lacks jurisdiction to order them to comply with CERCLA 120(h)(3)(C)(i), which requires that they gain approval from the Governor of Colorado before transferring property in which a remedial action is incomplete. *See* 42 U.S.C. § 9620(h)(3)(C)(i). To the extent Colorado requires the Army and FWS to follow the provisions of the Executive Order and State Policy before it grants approval, an injunction may indirectly require the Army and FWS to comply with these documents.

transfer was allegedly discussed and emails referencing the transfer on which CDPHE representatives were copied. *Id.* According to Federal Defendants, the Court may consider this material, because the statute of limitations is jurisdictional. Federal Defs.' Mot. to Dismiss 18 n.19.

The Court need not resolve whether the six-year statute of limitations is jurisdictional at this time.[12] Even considering Federal Defendants' evidence, a disputed issue of fact exists regarding CDPHE's knowledge of the transfer. As an initial matter, the evidence Federal Defendants submit does not undisputedly indicate that CDPHE knew or should have known of the illegality of the transfer in 2011. The notes and follow-up emails do not contain the date of the transfer, and they do not specifically state that the land was transferred to Commerce City, Colorado. *See* ECF Nos. 37-4, 37-5. If the land was transferred before the Arsenal was regulated under CERCLA, the transfer would not constitute a violation. Similarly, there would be no violation if the land was transferred to a federal entity. Therefore, without a specific reference to the date of the transfer and to whom the property was transferred, the Court cannot find as a matter of law that CDPHE had knowledge or should have had knowledge that the land was transferred in violation of CERCLA in

---

[12] Many courts, including the Tenth Circuit in an unpublished opinion, have held that 28 U.S.C. § 2401(a) is jurisdictional. *Urabazo v. United States*, 947 F.2d 955, at *1 (10th Cir. Oct. 21, 1991) (Table) (unpublished) ("Unlike an ordinary statute of limitations, § 2401(a) is a jurisdictional condition attached to the government's waiver of sovereign immunity, and as such must be strictly construed." (quoting *Spannaus v. United States Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987))); *Huntington Steel Corp. v. United States*, 153 F. Supp. 920, 922 (S.D.N.Y. 1957) ("Section 2401(a) of Title 28 U.S.C.A. in effect creates a jurisdictional prerequisite to suit."); *Felter v. Norton*, 412 F. Supp.2d 118, 124 (D.D.C. 2006) ("[T]he running of the statute of limitations is an absolute jurisdictional bar subject to a motion to dismiss under Rule 12(b)(1)."). However, the Tenth Circuit has subsequently noted that it has not determined this issue in a published opinion and that recent Supreme Court precedent renders the issue uncertain. *Wild Horse Observers Ass'n v. Jewell*, 550 F. App'x 638, 641 n.2 (10th Cir. 2013) (unpublished) (citing *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)). Given the uncertainty of the statute's jurisdictional nature and the fact that it is not determinative of the present motion, the Court declines to address it.

2011.

Moreover, CDPHE rebuts the evidence by submitting affidavits of the two representatives Federal Defendants claim had knowledge of the transfer. Aff. of Susan Newton; ECF No. 40-2; Aff. of Monica Sheets, ECF No. 40-3. Monica Sheets states that if she read the email, its "vague reference" to the transfer would have made her assume that the land had historically been transferred, not that the land was transferred recently. Aff. of Monica Sheets 3. According to Ms. Sheets, she first became aware of the transfer in 2015 during a discussion with Susan Newton. *Id.* at 3–4. Similarly, Ms. Newton states that until 2013, she believed the mapping showing the northeast corner of the Arsenal as zoned for residential use was a mistake or reflected an earlier change made by the Refuge Act. Aff. of Susan Newton 2–3. To be sure, Ms. Newton also states that she eventually became aware of the transfer through conversations in the months following a late-2010 or early-2011 meeting. *Id.* at 3–4. However, given that the initial meeting happened in late-2010 or early-2011, the Court cannot definitively find that Ms. Newton had notice of the allegedly illegal transfer before September 2011 (six years before this case was filed).[13]

In sum, even if 28 U.S.C. § 2401(a) is jurisdictional, the Court cannot find as a matter of law based on the evidence before it that CDPHE knew or should have known of the allegedly illegal transfer prior to September 14, 2011. *See City of Aurora, Colo. v. Bechtel Corp.*, 599 F.2d 382, 389 (10th Cir. 1979) (stating that "the question of whether or not the plaintiff actually discovered, or should have discovered" the violation "is a question which should be left for the trier of fact"); *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998) (stating that courts may determine as a matter

---

[13] If the Army and FWS present undisputed evidence at summary judgment indicating that the Army told Ms. Newton of the transfer and that Ms. Newton knew the transfer did not comply with CERCLA before September 2011, the Army and FWS may be entitled to summary judgment.

of law when a cause of action accrued only when the facts and dates are not disputed).

3.    CERCLA § 121(e)(2) Permits Injunctive Relief.

According to Federal Defendants, the Tenth Circuit has held that CERCLA § 121(e)(2), which permits a state to enforce a CERCLA requirement or standard, does not allow a state to seek injunctive relief. Federal Defs.' Mot. to Dismiss 19 (citing *State of Colorado v. Idarado Mining Co.*, 916 F.2d 1486 (10th Cir. 1990)).  The Court does not read the Tenth Circuit's holding so broadly. In *Idarado Mining*, the Tenth Circuit considered whether CERCLA § 121(e)(2) permits a state to seek an injunction requiring an entity to engage in "an extensive environmental cleanup plan proposed by the State and adopted, with various modifications, by the district court."  916 F.2d at 1487.  According to the court, the district court did not have authority to enter the injunction, because "§ 121(e)(2) limits a state's enforcement authority to 'any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform under this Act [CERCLA].'" *Id.* at 1494 (alteration in original) (quoting 42 U.S.C. § 9621(e)(2)).  In other words, a state cannot issue an injunction pursuant to CERCLA § 121(e)(2) compelling the initiation of a remedial action; § 121(e)(2) only permits states to enforce requirements of a federally created CERCLA action.  *Id.*  Because CDPHE does not seek an injunction compelling the initiation of a remedial action at the Arsenal, the holding in *Idarado Mining* does not preclude CDPHE's requested relief.

In their reply brief, Federal Defendants argue that pursuant to *Idarado Mining*, a state may enforce through an injunction only those requirements specifically embodied in a consent decree. Federal Defs.' Reply in Supp. of Mot. to Dismiss 14–15, ECF No. 41.  Put differently, Federal Defendants contend a consent decree underlying a CERCLA remedial action must specifically list

the standards that the defendant allegedly violated—here, that there be no transfers of federal land without prior approval. Again, *Idarado Mining* does not support Federal Defendants' argument. Although the Tenth Circuit stated that CERCLA § 121(e)(2) permits "states to enforce requirements of remedial actions embodied in consent decrees under CERCLA," the court made clear that requirements of federally initiated remedial actions are "embodied" in consent decrees, even when they are not specifically listed in the decree. *Idarado Mining*, 916 F.2d at 1494. The court stated, "When the EPA has determined that a particular standard or requirement is an ARAR for a particular remedial action, § 121(e)(2) merely allows a state to enforce that standard or requirement as an ARAR contained in a federal remedial action and implemented by a consent decree." *Id.* at 1495. Therefore, the consent decree merely implements the CERCLA remedial action; it need not contain every requirement with which the operator of a hazardous waste unit must comply.

In short, by its plain language, CERCLA § 121(e)(2) permits a state to enforce the requirements of an existing CERCLA remedial action. The Tenth Circuit's decision in *Idarado Mining* does not prevent states from enforcing those requirements through mandatory injunctions.

## CONCLUSION

Regarding Shell's Motion to Dismiss, the Court finds that CDPHE's first cause of action states a claim as to Shell. Specifically, CDPHE alleges that Shell is an operator of Basin F, and the CERCLA permit waiver does not apply to hazardous waste units not created by CERCLA. However, because CDPHE alleges only that Shell "allowed land to be transferred," CDPHE's second cause of action does not state a claim against Shell. Accordingly, the Court respectfully recommends that Shell's Motion to Dismiss [filed October 6, 2017; ECF No. 12] be **granted in part and denied in part**.

Regarding Federal Defendants' Motion to Dismiss, the Court finds that the United States of America, as a whole, is entitled to sovereign immunity over both of CDPHE's claims. Accordingly, the Court recommends that the District Court dismiss the United States of America. However, the Court finds that CDPHE's first and second causes of action state claims as to the Army and FWS. The Army and FWS are entitled to sovereign immunity only to the extent CDPHE seeks an injunction mandating that they comply with the specific requirements of the Executive Order and State Policy. Furthermore, the Court finds it premature to resolve the Army and FWS' statute of limitations defenses. Finally, CDPHE has sufficiently alleged that FWS is an operator of hazardous waste units at the Arsenal, and CERCLA § 121(e)(2) permits CDPHE to seek a mandatory injunction enforcing the requirements of a CERCLA remedial action. Accordingly, the Court respectfully recommends that Federal Defendants' Motion to Dismiss Plaintiff's Complaint Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [filed December 18, 2017; ECF No. 37] be **granted in part and denied in part**.[14]

---

[14]  Be advised that all parties shall have fourteen days after service to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676–83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen days after being served with a copy may bar the aggrieved party from appealing the factual and legal findings of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

Entered and dated at Denver, Colorado, this 5th day of March, 2018.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge